## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| Intelligent Wellhead Systems, Inc. and IWS USA Corp., §§§<br>*Plaintiffs*, § | |
| § | Civil Action No.: 6:24-cv-00263 |
| v. § | |
| § | |
| Downing Wellhead Equipment, LLC, §<br>*Defendant*. § | Demand For Jury Trial |

## COMPLAINT

Plaintiffs, Intelligent Wellhead Systems, Inc. and IWS USA Corp. (collectively, "IWS" or "Plaintiff"), for its Complaint against Defendant Downing Wellhead Equipment, LLC ("Downing" or "Defendant"), allege as follows:

## THE PARTIES

1. Intelligent Wellhead Systems, Inc. ("IWS Inc.") is a foreign entity formed under the laws of the Province of Alberta (Canada), with a principal place of business at 7633 57th Street SE, Calgary, Alberta, T2C 5M2. On January 1, 2024, IWS Inc. was acquired by Pason Systems Corp. (PSC), a foreign closely held entity, formed under the laws of the Province of Alberta (Canada), with a principal place of business at 6130 3rd St SE, Calgary, Alberta, T2H 1K4. PSC is now IWS Inc.'s parent.

2. IWS USA Corp. is a company formed under the laws of Delaware doing business with offices located at 6903 FM-359 Fulshear, TX 77441.

3. On information and belief, Downing Wellhead Equipment, LLC is an Oklahoma Limited Liability Company with its principal place of business located at 2601 NW Expressway, Suite 900E, Oklahoma City, Oklahoma 73112.

4. Downing has a field office in Houston, Texas located at 4741 World Houston Parkway, Suite 100.

5. Downing has another field office in Kilgore, Texas, located at 2706 Highway 135 North. Downing's Kilgore, Texas location "has been providing the Haynesville Shale and the East Texas and North Louisiana areas with frac rentals, wellhead systems, and production services."[1]

6. Downing may be served through its registered agent, CT Corporation System at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

7. This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.* ("DTSA"), and the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001 to 134A.008 ("TUTSA").

8. The claims for patent infringement arise under the patent laws of the United States, 35 U.S.C. § 271.

9. The Court has federal-question subject matter jurisdiction over IWS's patent infringement claims arising under the patent laws of the United States pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338 (patents). The Court has federal-question subject matter jurisdiction over IWS's trade secret misappropriation claim arising under the DTSA pursuant to 28 U.S.C. §§ 1331 (federal question).

---

[1] *See* https://downingusa.com/contact-us/kilgore-tx/.

10. The Court has supplemental jurisdiction over IWS's Texas Uniform Trade Secrets Act claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution and are based on the same underlying nucleus of fact.

11. This Court has personal jurisdiction over Downing. Downing has continuous and systematic business contacts with the State of Texas. Downing, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), conducts business extensively throughout Texas, by making, using, shipping, renting, offering to rent, advertising, selling, and/or offering to sell products and/or services in the State of Texas and the Eastern District of Texas. Downing maintains locations in Kilgore, Texas, Houston, Texas, San Antonio, Texas, and Midland, Texas and is responsible for sales, offers to sale, and/or use of infringing products and services in the United States, including in the Eastern District of Texas. Downing regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in the State of Texas and, in particular, in this District.

12. Downing, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more products and/or services in the stream of commerce that practice the Asserted Patents (as defined below) with the intention and expectation that they will be rented and/or purchased and used by consumers in the Eastern District of Texas. These products and/or services have been and continue to be purchased and used by production companies in the Eastern District of Texas.

13. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) at least because Downing maintains a regular and established place of business in Texas and within this

District, and Downing has committed acts of patent infringement in this District by using, renting, offering to rent, selling, and/or offering to sell, or otherwise providing infringing products, services, and/or systems in this District.  Downing has at least one physical location in the Eastern District of Texas at 2706 Highway 135 North, Kilgore, TX.  Upon information and belief, Downing has hundreds of employees working throughout the State of Texas, including within the Eastern District of Texas, and in cities such as Kilgore, Houston, San Antonio, and Midland.

14.     Upon information and belief, Downing manufactures the products, systems, and services accused of infringement in this case.

## THE ASSERTED PATENTS

15.     On March 15, 2022, the United States Patent and Trademark Office (USPTO) issued U.S. Patent No. 11,274,520 ("the '520 Patent") entitled "Apparatus, System and Process for Regulating a Control Mechanism of a Well."  IWS is the owner of the '520 Patent.  A copy of the '520 Patent is attached as Exhibit 1.

16.     On March 21, 2023, the USPTO issued U.S. Patent No. 11,608,708 ("the '708 Patent") entitled "Apparatus, System and Process for Regulating a Control Mechanism of a Well."  IWS is the owner of the '708 Patent.  A copy of the '708 Patent is attached as Exhibit 2.

17.     Intelligent Wellhead Systems Inc. is the owner in right, title, and interest in and to the '520 and '708 Patents (collectively, the "Asserted Patents").  The Asserted Patents are valid and enforceable, and the inventions claimed in the Asserted Patents were novel, non-obvious, unconventional, and non-routine at least as of their respective filing dates.

**FACTUAL BACKGROUND**

**IWS's Breakthrough Technology**

18. IWS designs, tests, manufactures, and deploys proprietary and unique digital safety and efficiency workflow technologies for oil and well completion operations.

19. IWS developed the inVision System to enhance safety and efficiency across wellsite operations by ensuring operation of desired valves at desired times while preventing operation of undesired valves at undesired times.

20. IWS's Digital Valve Control technology integrates sensors, safety controls, and best practices using the inVision System.

21. IWS's valve positioning sensors can, for example, detect and display real-time positions of hydraulic valves, giving users confirmation and assurance of a valve's actual position (i.e., open, closed, or partially opened/closed), which increases safety and eliminates the need for human operators to enter "the red zone" (generally known as the most dangerous area in drilling operations, where heavy machinery, including drill pipes, tongs, and rotary tables, operate continuously) to verify valve positions.

22. IWS's inVision® software, sensors, controls, and best practices have helped deliver more than 45,000 hydraulic fracturing stages without a single cut wireline, well shut-in, pressure control, or safety incident.[2]

23. IWS's systems also give operators offsite capabilities including monitoring and controlling valves via IWS's dashboard.

24. IWS's technological and innovative breakthroughs have led to the issuance of at least ten U.S. patents, two of which are at issue in this litigation.

---

[2] *See* https://www.linkedin.com/company/intelligent-wellhead-systems/ ("About")

**Downing's Infringing Activities**

25. Downing manufactures wellhead systems, rental equipment, and production equipment, and provides various aftermarket services.

26. Downing describes its Freedom Series Completion System ("FSCS") as a remotely operated completion system with "an integrated multi-chamber hydraulic valve with quick-connect latch system and optional ball dropper."

27. For example, below is a screenshot of the FSCS from a Downing YouTube video:



*See* https://www.youtube.com/watch?v=X0m9DcnZczE&ab_channel=DowningEnergyForward

28. Downing's Freedom Series ("FS") Valve is a multi-chamber hydraulic valve that Downing describes as "fully automated and IoT-enabled" allowing for pressure to be automatically equalized between the surface and wellbore.



29. Downing's FS iControl is a software package that allows for off-site monitoring and control of the FSCS. Below is a screenshot of the FS iControl software, as displayed in a Downing YouTube video on Downing's website:

7



(*available at* https://www.youtube.com/watch?v=ne35_FzfTDA and https://downingusa.com/freedomseries/continuouspumping/).

30. Downing's FS Control Center allows for on-site monitoring and control of the FSCS, including the FS Valve, outside of the redzone.

31. As shown below, in describing the FS Control Center, Downing says it "remotely closes FS Valve & Depressurizes Lubricator."



8

32. Downing is infringing one or more of the Asserted Patents by making, using, renting, offering to rent, selling, offering to sell, and/or otherwise providing Downing's Freedom Series tools, in this District.

33. IWS and Downing are direct competitors in the market of systems and methods for controlling hydraulic fracturing operations.

34. IWS has lost substantial sales because it competes with Downing and Downing's Freedom Series tools.

**Downing's Theft of Trade Secrets**

35. In June 2020, both IWS and Downing were working as vendors for EQT Corporation ("EQT") on a wellsite in Pennsylvania, PA.

36. EQT asked that IWS and Downing integrate their respective systems for use on the EQT wellsite.

37. Throughout June 2020, IWS worked with Downing to integrate Downing's system and application programming interface (API) with IWS's dashboard and lockout mechanisms and protocols with the aim of allowing EQT to remotely view information from Downing's valves using IWS's technology.

38. As part of the integration, IWS shared trade secrets with Downing, that Downing agreed to keep confidential.

39. IWS's trade secrets include information that is not readily available to the public. For example, the background software architecture of IWS's system is not easily identified and cannot be obtained by merely performing some basic internet research.  In order to independently develop the background architecture for IWS's system, a person would require, at a minimum, not only extensive experience with coding, but also confidential access to, and experience with,

integrating IWS's system with third party sensors and vendor data, if such information could even be independently developed.

40. As another example, the polling structure in IWS's system, which serves to improve data latency, is not publicly known and cannot be ascertained through basic internet research. Independent development of IWS's polling structure would also require extensive experience with coding and integrating IWS's system with third party sensors and vendor data, if such information could even be independently developed.

41. IWS took reasonable precautions to maintain the secrecy of these trade secrets, including marking materials as containing "confidential" information and securing written confirmation from Downing that such confidential information would only be used for purposes of the EQT project. Downing had an obligation to maintain these trade secrets as confidential and acknowledged this duty in June 2020.

42. It was not until, at the earliest, April 2023, that IWS realized that Downing had utilized IWS's confidential information and trade secrets because that was the first time Downing publicly released information showing its use of such information.

43. Downing impermissibly utilized IWS's trade secrets in developing Downing products and offering those products to the industry. Downing knew it utilized IWS trade secrets when developing its products that compete with the IWS systems.

## **COUNT I: INFRINGEMENT OF THE '520 PATENT**

44. Plaintiffs re-allege the foregoing paragraphs as if fully set forth here.

45. The '520 Patent is a valid and enforceable patent duly issued by the USPTO on March 15, 2022.

46. Intelligent Wellhead Systems, Inc. is the assignee of the '520 Patent with ownership of all substantial rights in the '520 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

47. Downing has infringed, contributed to the infringement of, and/or induced infringement of at least claims 1 and 11 of the '520 Patent by making, using, selling, renting, offering for sale, offering for rent, or importing into the United States, or by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more claims of the '520 Patent, literally or by the doctrine of equivalents, including, but not limited to, Downing's Freedom Series technology.

48. A more detailed analysis of Downing's infringement of claim 1 and claim 11 of the '520 Patent, literally or by the doctrine of equivalents, can be found in Exhibits 3-6, which are incorporated as though stated here in full.

49. Downing's infringement of the '520 Patent has been, and continues to be, willful, knowing, and intentional.

50. IWS has suffered economic harm because of Downing's infringing activities in an amount to be proven at trial, but in no case less than a reasonable royalty.

51. Downing has caused, and unless restrained and enjoined, will continue to cause, irreparable injury and damage to IWS for which there is no adequate remedy at law.  Unless enjoined by this Court, Downing will continue to infringe the '520 Patent.

## COUNT II: INFRINGEMENT OF THE '708 PATENT

52. Plaintiffs re-allege the foregoing paragraphs as if fully set forth here.

53. The '708 Patent is a valid and enforceable patent duly issued by the USPTO on March 21, 2023.

54. Intelligent Wellhead Systems, Inc. is the assignee of the '708 Patent with ownership of all substantial rights in the '708 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

55. Downing has infringed, contributed to the infringement of, and/or induced infringement of at least claims 1 and 24 of the '708 Patent by making, using, selling, renting, offering for sale, offering for rent, or importing into the United States, or by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more claims of the '708 Patent, literally or by the doctrine of equivalents, including, but not limited to, Downing's Freedom Series technology.

56. A more detailed analysis of Downing's infringement of claim 1 and claim 24 of the '708 Patent, literally or by the doctrine of equivalents, can be found in Exhibits 7-10, which are incorporated as though stated in full here.

57. Downing's infringement of the '708 Patent has been, and continues to be, willful, knowing, and intentional.

58. IWS has suffered economic harm because of Downing's infringing activities in an amount to be proven at trial, but in no case less than a reasonable royalty.

59. Downing has caused, and unless restrained and enjoined, will continue to cause, irreparable injury and damage to IWS for which there is no adequate remedy at law. Unless enjoined by this Court, Downing will continue to infringe the '708 Patent.

### COUNT III: MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS – TEXAS UNIFORM TRADE SECRETS ACT

60. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

61. IWS was one of the first companies to commercially deploy digital tools for remote completion operations that provide real-time data monitoring and remote operation to ensure safety, and to eliminate human error.

62. While IWS made efforts to acquire and maintain its multi-patent portfolio, significant amounts of information were known to IWS engineers and technical problem solvers that were never disclosed to the public or put into the public domain. For example, there were problems associated with data latency regarding the processing and displaying of data collected and shown only to operators (who were bound by confidentiality obligations) during completion procedures. There was also extensive technical experience related to collecting information regarding the status of valves, displaying the status, and visualizing the changing status of valves during pumping operations. IWS gained data, experience, and operating protocols regarding these concepts over its years of experience in operating its systems and this information, not known to its competitors, had value to IWS. IWS disclosed confidential solutions relating to the above-mentioned problems to Downing, along with other confidential information relating to the remote monitoring and control systems used in completion procedures.

63. IWS's confidential information is confidential, non-public, and proprietary to IWS and relates to IWS's business, scientific, technical, and/or engineering information, and thus, falls within the definition of trade secrets under the TUTSA.

64. IWS's trade secrets exist in at least IWS's information, program, device, method, technique, or process, whether tangible or intangible.

65. IWS has spent significant time and money developing its trade secrets and confidential and proprietary business information. IWS has also taken steps to protect this information from disclosure, including by limiting access to the trade secrets, by requiring employees to execute a confidentiality agreement that prohibits disclosure of confidential information, and by entering into agreements forbidding disclosure of such trade secrets and confidential information with third parties.

66. Downing explicitly informed IWS that it would maintain information received from IWS as confidential.

67. Downing utilized IWS's confidential information and trade secrets to develop, produce, rent, and/or sell their Downing Freedom Series technology which has undermined IWS's competitive position in the marketplace.

68. Downing had the specific opportunity to acquire IWS's trade secrets through the collaboration on the EQT wellsite.

69. Downing's conduct violates the TUTSA.

70. Downing willfully and maliciously misappropriated IWS's trade secrets by stealing this information with the malicious intent of using the trade secrets to develop Downing's products and systems to divert corporate opportunities away from IWS, and otherwise to the detriment of IWS.

71. Downing's unauthorized use of IWS's trade secret information has proximately caused IWS irreparable harm that can only be remedied by injunctive relief.

72. Downing's conduct was willful, malicious, and carried out with conscious disregard for IWS's rights.

73. Under the TUTSA, IWS is entitled to damages for actual loss and unjust enrichment, exemplary damages, attorney's fees, and injunctive relief on account of Downing's violation of the TUTSA.

### COUNT IV: MISAPPROPRIATION OF TRADE SECRETS –
### THE DEFEND TRADE SECRETS ACT OF 2016 (18 U.S.C. § 1836 *ET SEQ.*)

74. Plaintiffs re-allege the foregoing paragraphs as if fully set forth here.

75. IWS was one of the first companies to commercially deploy digital tools for remote completion operations that provide real-time data monitoring and remote operation to ensure safety and to eliminate human error.

76. While IWS made efforts to acquire and maintain its multi-patent patent portfolio, significant amounts of information were known to IWS engineers and technical problem solvers that were never disclosed to the public or put into the public domain. For example, there were problems associated with data latency regarding the processing and displaying of data collected and shown only to operators (who were bound by confidentiality obligations) during completion procedures. There was also extensive technical experience related to collecting information regarding the status of valves, displaying the status, and visualizing the changing status of valves during pumping operations. IWS gained data, experience, and operating protocols regarding these concepts over its year of experience in operating its systems and this information, not known to its competitors, had value to IWS. IWS disclosed confidential solutions relating to the above-mentioned problems to Downing, along with other confidential information relating to the remote monitoring and control systems used in completion procedures.

77. IWS's confidential information is confidential, non-public, and proprietary to IWS and relates to IWS's business, scientific, technical, and/or engineering information, and thus, falls within the definition of trade secrets under the DTSA.

78. IWS's trade secrets exist in at least IWS's information, program, device, method, technique, or process, whether tangible or intangible.

79. IWS has spent significant time and money developing its trade secrets and confidential and proprietary business information. IWS has also taken steps to protect this information from disclosure, including by limiting access to the trade secrets, by requiring employees to execute a confidentiality agreement that prohibits disclosure of confidential information, and by entering agreements forbidding disclosure of such trade secrets and confidential information with third parties.

80. Downing explicitly informed IWS that it would maintain information received from IWS as confidential.

81. Downing utilized IWS's confidential information and trade secrets to develop, produce, rent, and/or sell their Downing Freedom Series technology which has undermined IWS's competitive position in the marketplace.

82. Downing had the specific opportunity to acquire IWS's trade secrets through the collaboration on the EQT wellsite.

83. Downing's conduct violates the DTSA.

84. Downing willfully and maliciously misappropriated IWS's trade secrets by stealing this information with the malicious intent of using the trade secrets to develop Downing's products and systems to divert corporate opportunities away from IWS, and otherwise to the detriment of IWS.

85. Downing's unauthorized use of IWS's trade secret information has proximately caused IWS irreparable harm that can only be remedied by injunctive relief.

86. Downing's conduct was willful, malicious, and carried out with conscious disregard for IWS's rights.

87. Under the DTSA, IWS is entitled to damages for actual loss and unjust enrichment, exemplary damages, attorney's fees, and injunctive relief on account of Downing's violation of the DTSA.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

A. Entry of judgment in favor of Plaintiffs and against Defendant on all counts;

B. A judgment and order that Defendant infringes the Asserted Patents, either literally or by the doctrine of equivalents;

C. A judgment and order that the Asserted Patents are valid and enforceable;

D. Award Plaintiffs damages in an amount adequate to compensate Plaintiffs for Defendant's infringement of the Asserted Patents, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

E. A judgment and order awarding Plaintiffs damages caused by Defendant's misappropriation of trade secrets and/or disgorgement of any ill-gotten profits and/or a reasonable royalty;

F. Award enhanced damages under 35 U.S.C. § 284;

G. Award Plaintiffs pre-judgment and post-judgment interest to the full extent allowed under the law, as well as their costs;

H. Enter an order finding that this is an exceptional case and awarding Plaintiffs their reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

I. Enter a permanent injunction against all of Defendant's products found to infringe the Asserted Patents;

J. An order permanently enjoining Defendant, its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all persons and entities acting in concert with it, from misappropriating Plaintiffs' trade secrets;

K. Award, in lieu of an injunction, a compulsory forward royalty for infringement of the Asserted Patents;

L. Order an accounting of damages;

M. An award of attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code Section 38.001, and the applicable provisions under the DTSA and TUTSA;

N. Award such other relief, including equitable relief, as the Court may deem appropriate and just under the circumstances.

Date:  July 23, 2024

Respectfully submitted,

/s/ Tammy J. Terry
Tammy J. Terry, **Lead Attorney**
Texas State Bar No. 24045660
E-mail: terry@obwb.com
Califf T. Cooper
Texas State Bar No. 24055345
E-mail: cooper@obwb.com
Lisa E. Margonis
Texas State Bar No. 24070214
E-mail: margonis@obwb.com
Peter C. Schechter
Texas State Bar No. 24090761
E-mail: schechter@obwb.com
**OSHA BERGMAN WATANABE & BURTON LLP**
1100 Louisiana Street, Suite 4900
Houston, TX 77002
Telephone: (713) 228-8600
Fax: (713) 228-8778
E-mail: obwb-iws-downing@obwb.com

***Attorneys for Plaintiffs***