### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| INTELLIGENT WELLHEAD | § | |
| SYSTEMS, INC., and IWS USA | § | |
| CORP., | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 6:24-cv-00263-JCB |
| | § | |
| DOWNING WELLHEAD | § | |
| EQUIPMENT, LLC, | § | |
| | § | |
| *Defendant*. | § | |

### DEFENDANT DOWNING WELLHEAD EQUIPMENT, LLC'S
### MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL
### PROCEDURE 12(b)(6)

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE ISSUES ......................................................... 6

II.    LEGAL STANDARD ...................................................................... 7

III.    ARGUMENT ................................................................................ 8

    A.    IWS Fails to State a Claim for Trade Secret Misappropriation............ 8

        1.    IWS fails to identify a trade secret. .............................................. 9

        2.    IWS fails to plead misappropriation of its purported trade secrets........................................................................................... 14

    B.    The Asserted Patents are not Patent-Eligible Under § 101. ............... 16

        1.    The '708 Patent does not claim patent-eligible subject matter..................................................................................... 18

            a.    Step One: The claims are directed to an abstract idea. .................................................................................. 18

            b.    Step Two: The claims lack inventive concept. ................ 24

        2.    The '520 Patent does not claim patent-eligible subject matter..................................................................................... 26

            a.    Step One: The claims are directed to an abstract idea. .................................................................................. 26

            b.    Step Two: The claims lack inventive concept. ................ 28

    C.    IWS Fails to State a Claim for Relief for Induced, Contributory, or Willful Infringement ................................................................ 29

        1.    Contributory Infringement......................................................... 30

        2.    Induced Infringement................................................................. 32

        3.    Pre-Suit Willfulness ................................................................. 34

IV.    CONCLUSION............................................................................ 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)................................................................................ 17

*In re Abel,*
  838 F. App'x 558 (Fed. Cir. 2021) ..................................................................... 20, 21

*Alice Corp. Pty. v. CLS Bank Int'l,*
  573 U.S. 208 (2014) ................................................................................. 16, 17, 28

*Automation Middleware Solutions, Inc. v. Invensys Systems, Inc.,*
  No. 2:15-CV-00898-RWS, 2017 WL 11573945 (E.D. Tex. Mar. 31, 2017),
  *aff'd*, 737 F. App'x 1005 (Fed. Cir. 2018) ........................................................ 22, 23

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC,*
  827 F.3d 1341 (Fed. Cir. 2016)........................................................................... 24, 25

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................... 7, 8, 9, 11

*Berkheimer v. HP Inc.,*
  881 F.3d 1360 (Fed. Cir. 2018)........................................................................... 19, 27

*BillJCo, LLC v. Cisco Sys., Inc.,*
  No. 2:21-CV-00181-JRG, 2021 WL 6618529 (E.D. Tex. Nov. 30, 2021) .............. 32

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.,*
  778 F. App'x 882 (Fed. Cir. 2019) ......................................................................... 29

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
  316 F. Supp. 3d 1138 (N.D. Cal. 2018) ........................................................... 21, 22

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
  927 F.3d 1306 (Fed. Cir. 2019)........................................................................... 18, 21

*Credit Acceptance Corp. v. Westlake Servs.,*
  859 F.3d 1044 (Fed. Cir. 2017)........................................................................... 21, 28

*Dropbox, Inc. v. Synchronoss Techs., Inc.,*
  815 F. App'x 529 (Fed. Cir. 2020) ..................................................................... 17, 18

*Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC,*
    958 F.3d 1178 (Fed. Cir. 2020).................................................. 24

*Elec. Power Grp., LLC v. Alstom S.A.,*
    830 F.3d 1350 (Fed. Cir. 2016).................................................. 16

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
    365 F.3d 1054 (Fed. Cir. 2004).................................................. 31

*Intell. Ventures I LLC v. Cap. One Fin. Corp.,*
    850 F.3d 1332 (Fed. Cir. 2017).................................................. 25

*IPVX Patent Holdings, Inc. v. Estech Sys., Inc.,*
    Case No. 6:12-CV-173, Dkt. 21 (Mar. 20, 2013) .................................... 33

*In re Killian,*
    45 F.4th 1373 (Fed. Cir. 2022) ............................................. 25, 29

*Klausner Techs., Inc. v. Applied Voice & Speech Techs., Inc.,*
    Case No. 6:12-CV-168, Dkt. 33 (Mar. 20, 2013) ............................... 33, 34

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
    566 U.S. 66 (2012) .......................................................... 24

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
    837 F.3d 1299 (Fed. Cir. 2016).............................................. 16, 17

*Motiva Patents LLC v. Sony Corp.,*
    408 F. Supp. 3d 819 (E.D. Tex. 2019) .......................................... 32

*Nobelbiz, Inc. v. Insidesales.com, Inc.,*
    No. 6:13-CV-360-MHS, 2014 WL 12378804 (E.D. Tex. Oct. 14, 2014)
    ........................................................................ 30, 31, 32, 33

*NorthStar Sys. LLC v. Volkswagen AG,*
    No. 2:22-CV-486-JRG, Dkt. 66 (Aug. 30, 2024).................................... 34

*Phazr, Inc. v. Ramakrishna,*
    No. 3:19-CV-01188-X, 2019 WL 5578578 (N.D. Tex. Oct. 28, 2019) .................... 14

*Pyramid Instrumentation & Elec. Corp. v. Hebert,*
    No. 17-CV-1358, 2018 WL 1789325 (W.D. La. Mar. 14, 2018) ...................... 13, 14

*Solutran, Inc. v. Elavon, Inc.,*
    931 F.3d 1161 (Fed. Cir. 2019)............................................. 23, 28

*StoneEagle Servs., Inc. v. Valentine*,
  No. 3:12-CV-1687-P, 2013 WL 9554563 (N.D. Tex. June 5, 2013) .......... 10, 11, 12

*In re TLI Commc'ns Pat. Litig*,
  823 F.3d 607 (Fed. Cir. 2016).......................................................................... 17, 28

*Topstone Commc'ns, Inc. v. Xu*,
  No. 4:22-CV-00048, 2024 WL 1517637 (S.D. Tex. Apr. 8, 2024) ............... 9, 10, 11

*Touchstream Techs., Inc. v. Altice USA, Inc.*,
  No. 2:23-CV-00059-JRG, 2024 WL 1117930 (E.D. Tex. Mar. 14, 2024).............. 34

*Trinity Info Media, LLC v. Covalent, Inc.*,
  72 F.4th 1355 (Fed. Cir. 2023) ............................................................................ 25

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017)............................................................................ 25

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014).............................................................................. 16

*WeInfuse, LLC v. InfuseFlow, LLC*,
  No. 3:20-CV-1050-L, 2021 WL 1165132 (N.D. Tex. Mar. 26, 2021) .............. 12, 15

*Wellogix, Inc. v. Accenture, L.L.P.*,
  716 F.3d 867 (5th Cir. 2013) ................................................................................ 9

## Statutes

18 U.S.C. §§ 1832, 1839 ........................................................................... 9, 10, 13, 14

35 U.S.C. § 101.......................................................................................................*passim*

35 U.S.C. § 271(c)..................................................................................................... 30

TEX. CIV. PRAC. & REM. CODE ANN. § 134A ............................................... 9, 10, 13, 14

## I.     STATEMENT OF THE ISSUES

A year after Downing sued IWS in Colorado for patent infringement[1], IWS sued Downing for allegedly infringing two of IWS's patents—U.S. Patent Nos. 11,274,520 (the "'520 Patent") and 11,608,708 (the "'708 Patent") (collectively, the "Asserted Patents")—and for allegedly misappropriating IWS's trade secrets in connection with a 2020 joint project for a common customer (the "EQT Project"). IWS's Complaint is as bare-bones as they come—it fails to state any plausible claim for relief and should be dismissed in its entirety.

IWS's Complaint fails to identify a single protectable trade secret and contains no facts explaining *how* Downing misappropriated these unknown trade secret(s). Instead, IWS alleges that some unspecified "confidential information" exists *somewhere* within its "software," which Downing allegedly used to create its Freedom Series Completion System ("Freedom Series") technology. But Downing developed and released its Freedom Series before the EQT Project. And IWS neither identifies the feature(s) in its software that is entitled to trade secret protection nor pleads that this feature(s) is embodied in Downing's Freedom Series. IWS's conclusory claims—based on unidentified "confidential information" allegedly disclosed to Downing—cannot survive a motion to dismiss.

IWS's patent infringement claims fare no better. *First*, the Asserted Patents are directed to patent-ineligible abstract ideas and are, therefore, invalid. The '708

---

[1] *See Downing Wellhead Equipment, LLC v. Intelligent Wellhead Systems, Inc., et al.*; Case No. 1:23-cv-01180-RMR-SP (District Court for the District of Colorado) (filed May 10, 2023).

Patent's claims are directed to the use of a "controller circuit" (i.e., a generic computer) for engaging in a generic communication process that the patent calls a "handshake protocol." But this protocol comprises nothing more than communicating a signal to approve unlocking a valve. And the '520 Patent's claims are even broader—claiming a system comprising another generic "controller circuit" for communicating signals to control the position of a valve. In both instances, the claims do no more than apply generic computer components to an abstract idea and are not eligible for patent-protection as a matter of law. *Second*, IWS asserts claims for contributory, induced, and willful infringement that fail to recite even the most basic statutory "buzz words." Indeed, a *single sentence* comprises the entirety of IWS's contributory and induced infringement allegations. And IWS does not even plead that Downing had pre-suit knowledge of the Asserted Patents—a fundamental requirement for a claim of pre-suit willful infringement.

IWS's Complaint does not just fail to plead sufficient facts, it pleads hardly any facts at all and unfairly deprives Downing of the fair notice that it is entitled to. Accordingly, IWS's claims should be dismissed under Rule 12(b)(6).

## II. LEGAL STANDARD

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The Court is not bound to accept as true a legal conclusion

masquerading as a factual allegation. *Id.* at 678. The complaint must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action"; it must include factual allegations sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## III.    ARGUMENT[2]

### A.    IWS Fails to State a Claim for Trade Secret Misappropriation.

IWS's trade secret misappropriation claims stem from a June 2020 project where IWS and Downing worked together as vendors for a common customer—EQT Corporation—on a hydraulic fracturing wellsite in Pennsylvania. Dkt. 1, ¶ 35. The EQT Project required IWS and Downing to integrate their respective systems. *Id.* ¶ 36. Specifically, IWS and Downing worked together to integrate IWS's dashboard and IWS's lockout mechanisms and protocols with Downing's system and application programming interface. *Id.* ¶ 37. As part of that integration, IWS shared information with Downing, and Downing, in return, signed an agreement to keep IWS's information confidential. *Id.* ¶¶ 37, 41.

According to the Complaint, "IWS's trade secrets exist in at least IWS's information, program, device, method technique, or process, whether tangible or intangible." *Id.* ¶¶ 64, 78. And IWS alleges that "Downing impermissibly utilized IWS's trade secrets in developing Downing products and offering those products to the industry" (*Id.* ¶ 43), specifically Downing's Freedom Series (*Id.* ¶ 67), despite

---

[2] The facts set forth in this Motion are drawn from the Complaint's non-conclusory factual allegations, which are taken as true solely for the purposes of this motion.

the Freedom Series being developed and released a year prior. *Id.* ¶ 27. With nothing more than these threadbare allegations, IWS brings claims for trade secret misappropriation under both the federal Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA"). *Id.* ¶¶ 60-87.

To succeed on its trade secret misappropriation claims, IWS must show: (1) a trade secret exists, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) Downing used the trade secret without IWS's authorization.[3] 18 U.S.C. §§ 1832, 1839; TEX. CIV. PRAC. & REM. CODE ANN. § 134A; *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013) (quoting *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994)). IWS's Complaint fails to plead facts sufficient to infer that IWS's "confidential information" contained or comprised a "trade secret" or that Downing used or "misappropriated" this information. Instead, IWS's allegations comprise nothing more than a recitation of the legal elements for a trade secret misappropriation claim. But a mere "formulaic recitation of the elements of a cause of action" does not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. IWS's trade secret misappropriation claims should be dismissed.

### 1.    IWS fails to identify a trade secret.

IWS's generic reference to "confidential information" within its "software," without more, fails to identify a "trade secret" with sufficient particularity to

---

[3] The elements for a cause of action under TUTSA and DTSA are identical. *See* 18 U.S.C. § 1839(3); TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6).

survive a motion to dismiss. *See Topstone Commc'ns, Inc. v. Xu*, No. 4:22-CV-00048, 2024 WL 1517637, at *3 (S.D. Tex. Apr. 8, 2024) (granting Rule 12(b)(6) motion as to trade secret misappropriation claim and noting the "growing consensus among district courts in this circuit that plaintiffs bringing claims of trade secret misappropriation must 'identify, with reasonable particularity, the alleged trade secrets at issue'") (quoting *UOP LLC v. Exterran Energy Sols.*, L.P., No. 4:21-CV-02804, 2021 WL 8016712, at *1 (S.D. Tex. Sept. 28, 2001) (quoting *StoneEagle Servs., Inc. v. Valentine*, No. 3:12-CV-1687-P, 2013 WL 9554563, at *2 (N.D. Tex. June 5, 2013) (collecting cases))).

Under both the DTSA and TUTSA, a "trade secret" ***may*** include "all forms and ***types*** of…information, including…methods, techniques, processes,…programs, or codes…whether tangible or intangible." 18 U.S.C. § 1839(3); TEX. CIV. PRAC. & REM. CODE § 134A.002(6). "While plaintiffs need not identify specific trade secrets in their pleadings, they do need to describe the trade secrets with enough clarity for defendants to understand how each claimed trade secret differs from information in the public domain." *Topstone*, 2024 WL 1517637, at *3 (citations and quotations omitted). Repeating statutory language or describing ***types*** of information that ***may*** constitute a trade secret is insufficient:

> [C]ourts have dismissed complaints that allege trade secrets in 'broad, categorical terms, more descriptive of the ***types*** of information that generally ***may*** qualify as protectable trade secrets than as any kind of listing of particular trade secrets the plaintiff has a basis to believe actually were misappropriated."

*Id.* (emphasis added)[4] (quoting *Am. Biocarbon, LLC v. Keating*, No. 20-CV-00259, 2020 WL 7264459, at *5 (M.D. La. Dec. 10, 2020) (dismissing DTSA claim where plaintiff's "conclusory allegations fall well short of the particularity standard necessary to separate its alleged trade secret(s) from matters of general knowledge")). And, in the context of trade secrets found in software or source code, "generally listing software, data processing algorithms, and processes that a plaintiff developed, owned, or licensed" is insufficient. *StoneEagle,* 2013 WL 9554563, at *4.

IWS fails to identify its alleged trade secrets with any particularity, let alone with the level of particularity required to survive a motion to dismiss. Under the Complaint's "Counts" for trade secret misappropriation, IWS parrots the language of the DTSA and TUTSA, stating that "trade secrets exist in at least IWS's information, program, device, method, technique, or process, whether tangible or intangible." Dkt. 1, ¶¶ 64-65, 78-79. But IWS never identifies ***what*** "information, program, device, method, technique, or process" constitutes the alleged "trade secrets." This is insufficient. *See Twombly*, 550 U.S. at 555; *Topstone*, 2024 WL 1517637, at *3.

While the body of the Complaint obscures its lack of specificity with vague technical jargon, it provides no further insight than the information comprised within the "Counts." For example, IWS states generally that its trade secrets are found in its "confidential information," but IWS again does not explain ***what*** this

---

[4] All emphasis is added unless noted otherwise.

11

confidential information is. *See* Dkt. 1, ¶¶ 35-43. IWS also states generally that its trade secrets are found in its "software" or "program"—e.g., the "background software architecture" and "polling structure" of "IWS's system," which IWS asserts is "not publicly known." Dkt. 1, ¶¶ 39-40, 64-65, 78-79. But these allegations still only identify a *type* of information that generally *may* constitute a trade secret—it does not identify what unique information, software feature, or portion of code *is* the trade secret.

Without identifying what constitutes the alleged trade secrets, neither Downing nor the Court can assess IWS's conclusory claim that this "confidential information"—whatever it may be—is generally unknown, determine whether it derives independent economic value from its secrecy, or discern what is at issue in the case going forward. *See StoneEagle Servs.*, 2013 WL 9554563, at *2-4 (describing that without a sufficient identification of a trade secret in the Complaint: (1) "lawsuits might be filed as mere 'fishing expeditions'"; (2) "both defendants and courts will have difficulty evaluating the relevance of discovery requests and propriety of objections"; and (3) "defendants cannot formulate and/or mount a defense"). IWS is in the best position to articulate what its alleged trade secrets are, but it has failed to do so.

Courts routinely dismiss trade secret claims with such thin disclosure. For example, in *WeInfuse, LLC v. InfuseFlow, LLC*, the complaint generally alleged that plaintiff's "Software" including "its functionalities, user interface and display and design, interworkings of various components and modules, logic flows, databases,

and schema" were protectable trade secrets. No. 3:20-CV-1050-L, 2021 WL 1165132, at *3 (N.D. Tex. Mar. 26, 2021). The court found such descriptions "far too broad to qualify as trade secrets" and noted that the plaintiff had "failed to point to specificities that convey the unique capabilities of the Software." *Id.* The court dismissed the complaint because "[w]ithout any indication of such special characteristics, the court cannot reasonably infer that the Software's features and functionalities as described by Plaintiff are not generally known within the industry or readily ascertainable through proper means." *Id.* Here, IWS's disclosure of its alleged trade secrets is even more ill-defined.

In addition to failing to identify the alleged trade secrets, IWS's Complaint fails to allege that IWS's trade secrets—whatever they may be—derive "independent economic value" from their secrecy. *See* 18 U.S.C. § 1839(3)(B); TEX. CIV. PRAC. & REM. CODE § 134A.002(6). IWS does not even mention the "independent economic value" of its alleged trade secrets, let alone describe **how** that information derives independent economic value from not being publicly known. Instead, IWS generally states that its "background software" and "polling structure" are "not publicly known" and "not known to [IWS's] competitors." Dkt. 1, ¶¶ 39, 40, 62. This is insufficient. *See Pyramid Instrumentation & Elec. Corp. v. Hebert*, No. 17-CV-1358, 2018 WL 1789325, at *3-4 (W.D. La. Mar. 14, 2018), *R. & R. adopted*, No. 2:17-CV-1358, 2018 WL 1788621 (W.D. La. Apr. 13, 2018) (finding that possessing "confidential and proprietary information" that is "not readily

13

ascertainable through proper means by persons not employed by [a plaintiff]," is "not enough to show the independent economic value" of a trade secret).

In summary, IWS's Complaint provides only a bare conclusory recitation of the elements for what a "trade secret" could be, without describing what the trade secrets at issue actually are. Thus, IWS's Complaint fails to demonstrate a plausible claim for trade secret misappropriation under the DTSA and TUTSA.

### 2. IWS fails to plead misappropriation of its purported trade secrets.

IWS also failed to sufficiently plead misappropriation of its alleged trade secrets. To state a claim for trade secret misappropriation under DTSA and TUTSA, IWS must plead facts that showing that the trade secret was ***actually used***. 18 U.S.C. § 1839(5)(B); Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B). IWS pleaded no such allegations.

At best, IWS alleges that Downing had ***access*** to IWS's "confidential information" through the EQT Project. But mere access is insufficient. *Phazr, Inc. v. Ramakrishna*, No. 3:19-CV-01188-X, 2019 WL 5578578, at *4 (N.D. Tex. Oct. 28, 2019) (dismissing former employer's misappropriation claim where employer "merely recites the elements of a Trade Secrets Act claim as its allegations" and "failed to show that [defendant] [] acquired or used one of [employer's] trade secrets" despite the former employees having learned of the trade secrets during their employment).

Here, IWS does not plead any factual support for its conclusion that Downing used IWS's "confidential information" from the EQT Project. *See* Dkt. 1 ¶¶ 41, 66-

14

68.[5]  While IWS facially concludes that Downing "utilized IWS's trade secrets in developing Downing products," that is merely a conclusory recitation of a legal element. IWS's Complaint also fails to support this bare conclusion because it does not explain **how** IWS used the information. IWS does not compare the functionality or features of its own purported trade secret information to functionality or features in Downing's Freedom Series. *See WeInfuse, LLC*, 2021 WL 1165132, at *3-4.  And IWS does not explain how Downing could have plausibly used IWS's purported trade secrets in Downing's Freedom Series when that technology predates the parties' involvement in the EQT Project by a year.[6]  *See* Dkt. 1, ¶¶ 27 (citing a video about the Freedom Series posted March 5, 2019). To the extent that Downing subsequently released new versions of the Freedom Series with additional features, IWS does not compare or explain what differences or features in the Freedom Series are the result of Downing's alleged use of IWS's trade secrets. Nothing in IWS's Complaint leads to a plausible conclusion that Downing actually used IWS's alleged trade secrets.

---

[5] Indeed, IWS does not even identify basic facts regarding the form of the purported "confidential information" that IWS allegedly shared with Downing (e.g., software source code, software documentation, user manuals, etc.).

[6] The Complaint states that April 2023, was the first time that "IWS realized that Downing had utilized IWS's confidential information and trade secrets because that was the first time Downing publicly released information showing its use of such information." Dkt. 1, ¶ 42.  But the Complaint provides no factual detail concerning this "public release" to verify its existence or the contents therein.  IWS does not describe what type of release it was, where it was released, what information was provided that indicated that IWS's confidential information was being used, or how IWS was able to identify that its confidential information was being used.  IWS also does not explain why it never raised any objection to Downing's alleged use of IWS's trade secrets for over a year after supposedly discovering it.

In summary, IWS's Complaint does little more than recite the legal elements of a trade secret misappropriation claim under the DTSA and TUTSA. The Complaint lacks the critical factual allegations necessary to put Downing on notice of the claims against it. IWS's claims for trade secret misappropriation under the DTSA and TUTSA should be dismissed under Rule 12(b)(6).

## B.    The Asserted Patents are not Patent-Eligible Under § 101.

To obtain a patent, an applicant must show that its invention meets the requirements of patentability.  These requirements include showing that the invention is of the type that is eligible for a patent. 35 U.S.C. § 101. Patents that do not claim patent-eligible subject matter are invalid and complaints asserting such patents fail to state a claim for relief and should be dismissed. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711-12 (Fed. Cir. 2014).

As the Supreme Court has explained, § 101 denies a patent to some types of inventions that seek to monopolize the "building blocks of human ingenuity." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). For this reason, claims directed to "[l]aws of nature, natural phenomena, and abstract ideas" are "patent-ineligible."  *Id.* at 216-17. Courts analyze patent-eligibility under § 101 using the two-step *Alice* framework. *Id.* at 216-226.

At Step One, courts determine what the claims are "directed to." *Id.* at 216, 225. In so doing, courts look to the "focus" of the claims. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). And, viewing the claims "as a whole," courts determine "whether the claims [] focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect

16

that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). If the Court concludes that the claims are directed to patent-ineligible subject matter, the inquiry proceeds to *Alice* Step Two. *Alice*, 573 U.S. at 221.

At Step Two, courts determine whether a claim directed to patent-ineligible subject matter nonetheless contains an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Id*. at 217. For a claim to contain an "inventive concept," it must comprise more than the recitation of "well-understood, routine, and conventional activities previously known in the industry." *Id.* at 225 (internal quotations omitted); *see also In re TLI Commc'ns Pat. Litig*, 823 F.3d 607, 615 (Fed. Cir. 2016) (concluding patent claims ineligible at *Alice* step two in part because "the recited physical components behave exactly as expected according to their ordinary use").

"[T]he ultimate determination of eligibility under § 101 is a question of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). "[L]ike many legal questions, there can be subsidiary fact questions which must be resolved *en route* to the ultimate legal determination." *Id*. Whether a claim element is "well-understood, routine, and conventional to a skilled artisan" is ordinarily a question of fact. *Id.* But "[a]ny allegation about inventiveness, wholly divorced from the claims or the specification" does not defeat a motion to dismiss; only "plausible and specific factual allegations that aspects of the claims are inventive are sufficient." *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529,

17

538 (Fed. Cir. 2020) (quoting *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019)).

Here, the claims of the Asserted Patents are directed to the patent-ineligible abstract ideas of using generic "controllers" for communicating signals to unlock a valve (the '708 Patent) and communicating signals to control the position of a valve (the '520 Patent). Further, the claim elements, alone and in combination, do not contain an "inventive concept." No factual allegations in the Complaint—including the patent specifications and claims—can plausibly support a finding of an "inventive concept." Because the claims of the Asserted Patents are not patent-eligible under § 101, IWS's claims for infringement of the Asserted Patents should be dismissed.

### 1. The '708 Patent does not claim patent-eligible subject matter.

#### a. Step One: The claims are directed to an abstract idea.

Claims 1 and 24 of the '708 Patent are method claims directed to the same invention—each claims a "process for regulating a wellhead control mechanism." For example, Claim 1 recites:

> 1. A process for regulating a wellhead control mechanism, the process comprising:
>
>> locking out the wellhead control mechanism so that it cannot actuate; and
>>
>> ***performing a handshake protocol*** to determine if the locked out wellhead control mechanism can be released and then actuated, wherein the handshake protocol comprises ***an initiator signal communicated by a controller*** circuit to a first user and the first user ***sending a confirmatory signal to the controller circuit*** when the wellhead control mechanism can be unlocked safely.

18

Dkt. 1-2 (the '708 Patent). The only difference between claim 1 and claim 24 is how the handshake protocol is performed. In claim 1, the computer sends the initiator signal, and the human user sends the confirmatory signal. In claim 24, the opposite occurs—the human sends the initiator signal, and the computer sends the confirmatory signal. For the purposes of § 101, this difference is negligible, and claim 1 is representative of both claims. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

The claimed method comprises two steps: (1) locking a wellhead control mechanism (e.g., a valve) and (2) performing a "handshake protocol." Dkt. 1-2, claims 1, 24. The specification describes "locking out" the valve as holding a valve in the open, partially open, or closed position such that it cannot move. *Id.* at 8:61-64 ("When…the valve actuator is locked, the valve cannot be actuated and the valve is held in either an open position, a partially open position or a closed position."). And the "handshake protocol" comprises no more than sending an "initiator signal" and a "confirmatory signal," which the specification characterizes as granting "approval" to perform an action. *Id.* at Fig. 21 (showing the "confirmatory signal" as "Approve Action" in response to an "Initiator" in "handshake protocol" 2030), 33:8-35:10 (describing the handshake protocol as requesting and confirming "approval" of an action). These are the only two steps of the claimed method.[7]  Viewed as a whole, the claims are directed to the abstract idea of communicating signals.

---

[7] Notably, instead of requiring unlocking or releasing the mechanism in response to the signals, the claims only require communicating whether it "***can*** be released." Dkt. 1-2, claim 1.

The specification confirms that the "focus" of the claims is "communication." For example, the problem identified by the specification is "miscommunication" resulting from "a complicated and busy wellpad…which in turn can result in mistakes and accidents occurring." *Id.* at 1:21-27. One way that the patent offers to solve this "miscommunication" problem is through the implementation of a "handshake protocol" that "regulates" the ability of the human user or computer to communicate with the components on the wellpad "until the requirements of the handshake protocol are satisfied." *Id.* at 26:26-36. But the specification later reveals (as do the Asserted Claims) that the "handshake protocol" is "satisfied" by nothing more than sending a generic "confirmatory signal" to or from a computer. *Id.* at 33:8-35:10. While the claims may mask their abstract nature with technical jargon—using words like "handshake protocol" (i.e., sending generic signals) and "controller circuit" (i.e., a generic computer)—in reality, they merely involve using a computer to communicate—send and receive signals—between wellhead components instead of having human actors perform those communications.

Merely employing a generic computer to perform a communication practice is not patent eligible. *In re Abel*, 838 F. App'x 558, 561 (Fed. Cir. 2021). For example, in *In re Abel*, a patent claimed the process for "allow[ing] a user to send and receive physical letters and/or goods to another user without divulging personal information." *Id.* at 559. The court found that the "focus" of such claims was on "using a generic computer as a tool to perform a communication practice—giving a message to an intermediary who, unlike the sender, knows the intended recipient's

location"—and thus the claims were directed to an abstract idea. *Id.* at 561.

Likewise, the "focus" of the claims of the '708 Patent is on "using a generic computer

to perform a communication practice"—i.e., sending a signal asking for permission

to control a mechanism ("initiator signal") and receiving a signal granting

permission to do so ("confirmatory signal"). *See id.* "[S]uch a method of organizing

human activity is an abstract idea." *Id.*; *see also Credit Acceptance Corp. v. Westlake

Servs.*, 859 F.3d 1044 (Fed. Cir. 2017) ("[M]ere automation of manual processes

using generic computers does not constitute a patentable improvement.").

    The court's analysis in *Cellspin Soft, Inc. v. Fitbit, Inc.*, is instructive.

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 316 F. Supp. 3d 1138 (N.D. Cal. 2018).  There, the

court found that an invention related to a "handshake protocol" was directed to an

abstract idea at Step One.  Specifically, the patent recited the following:

> By implementation of a ***handshake protocol***, the [Bluetooth]
> communication device [ ] automatically transfers captured data, the
> multimedia content, and the associated files to the client application [ ]
> on the mobile device [ ]. For some external digital data capture devices,
> the client application [ ] may not be able to detect the creation of a new
> file. In such cases, the digital data capture device [ ] ***signals*** the client
> application [ ] in the event a new file is created. A file event listener in
> the client application [ ] ***listens for the signal*** from the digital data
> capture device [ ]. ***The user may then initiate the transfer by a
> press of a button or a key on the digital data capture device [ ]***.

*Id.* at 1154. The court held that the claims were directed to the patent-ineligible

idea of acquiring, transferring, and publishing data from one device to another.[8]  *Id.*

---

[8] The Federal Circuit vacated and remanded on other grounds, but not before
affirming the district court's Step One decision. *Cellspin*, 927 F.3d 1306, 1315-16
(Fed. Cir. 2019).

at 1152 (citing *Affinity Labs. of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262-63 (Fed. Cir. 2016) (claims which "recite[] the use of generic features of [hardware components] as well as routine functions, such as transmitting and receiving signals to implement the underlying idea" do not contain a sufficient inventive idea)). Here, the '708 Patent's claims are similarly drawn to a mere "handshake protocol"—sending and receiving signals—without any "technical details for the tangible components" and using only "known computer components." *Id.* at 1151-54 (internal quotations omitted). This is not a technological improvement entitled to patent protection.

Similarly, in *Automation Middleware Solutions, Inc. v. Invensys Systems, Inc.*, this Court found that a claim reciting "a network ***communication protocol*** that allows [] control commands to be communicated from the control command generating module on the at least one work station to at least one of the supported hardware devices over a network" constituted an unpatentable abstract idea. No. 2:15-CV-00898-RWS, 2017 WL 11573945, at *5 (E.D. Tex. Mar. 31, 2017), *aff'd*, 737 F. App'x 1005 (Fed. Cir. 2018). The *Automation Middleware* patent—like the '708 Patent—purported to "solve the problem of miscommunication" through its implementation of a "middle layer of software"—what the claims referred to as a "***communication protocol***"—to "be a bridge in communication between two things that do not speak the same 'language.'" *Id.* at *8. The court rejected plaintiff's arguments that the claims were directed to software that "improve[s] the functioning of motion control systems," and instead found that the claims were

directed to the patent-ineligible abstract idea of "a middle translating layer." *Id.* at
*8-9. The result should be the same here.

Finally, merely reciting a step in the physical world, such as "locking" the
wellhead control mechanism, is not enough to exempt the claims from being
directed to an abstract idea. The Federal Circuit's analysis in *Solutran, Inc. v.
Elavon, Inc.* is instructive. 931 F.3d 1161 (Fed. Cir. 2019). There, patent claims
were directed to a method for processing paper checks, with similar generic
communication steps such as "receiving…data." *Id.* at 1164. The court found that
the claims were directed to an abstract idea, and it rejected the plaintiff's
arguments that "the physicality of the paper checks being processed" somehow
"exempt[ed] the claims from being directed to an abstract idea." *Id.* at 1168. The
court explained that "the abstract idea exception does not turn solely on whether
the claimed invention comprises physical versus mental steps. In fact, the claimed
methods in *Bilski* and *Alice* also recited actions that occurred in the physical world."
*Id.* (internal quotations omitted).

The same analysis applies here. The "focus" of the '708 Patent's claims, as
indicated by both the specification and the claims, is using a computer to perform a
communication practice—the "handshake protocol"—to approve unlocking a well.
The step of "locking" the well is insignificant pre-solution activity that does not
exempt the claims from being directed to an abstract idea. Because the focus of the
'708 Patent's claims is a generic communication process, the claims are directed to a
patent-ineligible abstract idea and fail at *Alice* Step One.

### b. Step Two: The claims lack inventive concept.

The claims at issue do not include an inventive concept because they are "specified at a high level of generality, [are] specified in functional terms, and merely invoke[] well-understood, routine, and conventional components and activity to apply the abstract idea." *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178 (Fed. Cir. 2020). As previously described, the claims include two basic steps: (1) locking the mechanism, and (2) performing the "handshake protocol." *See e.g.*, Dkt. 1-2, claim 1.

*First*, nothing in the '708 Patent indicates that locking the wellhead control mechanism is an "inventive concept"—and such an argument would border on absurd. And nothing in the patent limits the invention to any specific way or steps for holding the mechanism in "an open position, a partially open position or a closed position." Dkt. 1-2, 8:61-64. In fact, the specification indicates that "locking" a valve is a concept already known in the art. *Id*. at 13:8-11 ("As will be appreciated by those skilled in the art, when the wellhead valve is locked in an open position that includes both a partially opened or a completely opened position.") Thus, the "locking" step is a "purely conventional or obvious pre-solution activity" that cannot "transform an unpatentable [abstract idea] into a patent-eligible application." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 79 (2012).

*Second*, the handshake protocol (i.e., sending and receiving signals) cannot supply the inventive concept. A "handshake protocol" is just another way of saying "a communication practice," which is why the claim is abstract. The abstract idea itself cannot supply the inventive concept as a matter of law. *Bascom Glob. Internet*

24

*Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself…."); *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) ("[D]escrib[ing] the functions of the abstract idea itself, without particularity…is simply not enough under step two."). Moreover, even if the Court finds that the abstract idea is something other than the "handshake protocol," the protocol itself consists of nothing more than sending generic and conventional "signals" performed by a "controller circuit," which, again, is no more than a conventional communication practice and cannot supply the required "inventive concept." *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1367 (Fed. Cir. 2023) ("[A] claim is not rendered patent eligible by stating an abstract idea and instructing 'apply it on a computer.'"). Limiting the use of the idea "to a particular technology environment" is also insufficient for establishing an inventive concept under Step Two. *In re Killian*, 45 F.4th 1373, 1383 (Fed. Cir. 2022).

*Finally*, the ordered combination does not provide an inventive concept because the combination of elements is conventional and expected. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1341 (Fed. Cir. 2017) (finding that the ordered combination of elements did not contain an inventive concept when steps were "organized in a completely conventional way"); *Trinity Info Media*, 72 F.4th at 1366 (finding that the ordered combination of elements did not contain an inventive concept when steps were "organized in an expected way"). The

two steps of the '708 Patent's claimed method (i.e., (1) locking the wellhead control mechanism, and (2) performing the "handshake protocol") are similarly organized in an expected way—it is logical to first lock the mechanism before engaging in a "handshake protocol" to communicate whether it can be unlocked.

Given the '708 Patent's claims' failure to satisfy *Alice*'s Step One and Step Two inquiries under 35 U.S.C. § 101 as a matter of law, the Complaint should be dismissed with respect to these claims.

**2.    The '520 Patent does not claim patent-eligible subject matter.**

Claims 1 and 11 of the '520 Patent are likewise directed to patent-ineligible subject matter—the abstract idea of sending and receiving signals with a generic computer to control the position of a wellhead valve. Like the '708 Patent, there is no inventive concept in the '520 Patent's claims that could save them.

***a.  Step One: The claims are directed to an abstract idea.***

Claim 11 of the '520 Patent states:

11.  A system for controlling orientation of a valve, the system comprising:

> (a) a valve assembly that comprises:
>
>> (i) ***a valve*** body for housing the valve that is configured to move between an open position, a closed position and therebetween for controlling a fluid flow therepast,
>>
>> (ii) an actuator that is positioned remotely from the valve body, wherein the actuator is configured to move between a first position, a second position and therebetween and wherein the ***actuator is operatively coupled to the valve by a conduit for controlling the position of the valve***; and
>>
>> (iii) a controlled actuator that is configured to ***receive commands*** for moving the actuator,

26

> (b) a controller that is configured to **send commands** to the
> controlled actuator.

Dkt. 1-1 ('520 Patent), claim 11. The only difference between claim 1 and claim 11 is
that claim 1 omits two elements: "[a] system for controlling orientation of a valve,
the system comprising" (i.e., the preamble) and the "controller that is configured to
send commands to the controlled actuator." *See id.*, claim 1. Since all limitations of
claim 1 are also found in claim 11, there is no distinctive significance between
them—claim 11 is representative of both claims. *See Berkheimer*, 881 F.3d at 1365.

The '520 Patent's claims recite nothing more than a generic computer
sending and receiving signals to control the position of a valve. For example,
limitation 11(a) recites "a valve assembly." Dkt. 1-1, claim 11. Limitation 11(a)(i)
recites a "valve body for housing a valve," this valve being capable of "mov[ing]
between an open position, a closed position and therebetween for controlling a fluid
to flow therepast." *Id.* This merely describes a valve—a body with a component that
can be open, closed, or "therebetween" to let fluid flow. Limitation 11(a)(ii) adds an
"actuator" that is "operatively coupled" to the valve by a "conduit for controlling the
position of a valve." *Id.* The "actuator" is a generic component that controls the
orientation of a valve (e.g., a "lever," "switch," or "button"). *Id.* at 1:37-41. And the
"conduit" is a physical structure that conducts fluid (e.g., a pipe). *Id.* at 10:47-52.
These claim limitations only describe a conventional valve assembly.

Finally, claim 11 recites a "controlled actuator" that is "configured to receive
commands for moving the actuator" and "a controller" that is "configured to send
commands" (i.e., generic signals) "to the controlled actuator." *Id.* at claim 11. In

plain English, these limitations just add a computer that communicates generic signals to an automated lever that opens and closes the conventional valve.

The specification of the '520 Patent, like the '708 Patent, purports to solve a problem of "miscommunication." Dkt. 1-1, 1:25-27. But the claims do not offer any technical solution beyond "automation of [a] manual process[]." *Credit Acceptance Corp.*, 859 F.3d at 1051. While the claims do recite "tangible components," "not every claim that recites concrete tangible components escapes the reach of the abstract-idea inquiry." *In re TLI Commc'ns*, 823 F.3d at 611. Like the '708 Patent's claims, adding a "controller" and "controlled actuator" does not make the '520 Patent's claims any less abstract. *Alice*, 573 U.S. at 223 ("Stating an abstract idea while adding the words 'apply it with a computer'…cannot impart patent eligibility.") Like the '708 Patent, physicality, on its own, is not enough to exempt a claim from being directed to an abstract idea. *See Solutran*, 931 F.3d at 1168.

In sum, the '520 Patent's claims are directed the abstract idea of sending and receiving signals to control the position of a wellhead valve. Accordingly, the claims are directed to a patent-ineligible abstract idea, and they fail at Step One.

### b. *Step Two: The claims lack inventive concept.*

The '520 Patent's claims lack an inventive concept that would transform the abstract idea into a patent-eligible invention. As explained above, the claims recite no more than a "valve," an "actuator" (e.g., a lever or switch), a "conduit" (e.g., a pipe), a "controlled actuator" (e.g., a lever or switch controlled by the computer), and a "controller" (i.e., a generic computer). These components make up no more than a conventional valve assembly and a generic computer.

28

As with the '708 Patent, the '520 Patent does not describe any new and useful improvement to "the performance of the computer itself," but rather describes generic and conventional components "aided by conventional computers." *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 893 (Fed. Cir. 2019). As with the '708 Patent, the '520 Patent's claims (even considered as an ordered combination) do not provide any "technical solution beyond simply using generic computer concepts." *In re Killian*, 45 F.4th at 1382. The '520 Patent's claims do not even describe ***how*** the computer operates to automatically turn the valve on and off—they lack any meaningful limitation that could possibly supply an inventive concept.

The claims of the '520 Patent fail at Step Two. Accordingly, the claims are not eligible for patent protection under 35 U.S.C. § 101 and, thus, are invalid. Accordingly, IWS's claims for patent infringement should be dismissed.

### C.    IWS Fails to State a Claim for Relief for Induced, Contributory, or Willful Infringement

Because IWS's claims are invalid, IWS cannot state a claim for infringement—direct or indirect. But even if the claims are found to not be invalid at this stage, IWS still cannot sustain its claims for induced, contributory, and willful infringement.

IWS's allegations for contributory and induced infringement for both Asserted Patents comprise a single, nearly identical sentence:

> Downing has infringed, ***contributed to the infringement of, and/or induced infringement*** of at least claims 1 and 11 for the '520 Patent [claims 1 and 24 of the '708 Patent] by making, using, selling, renting, offering for sale, offering for rent, or importing into the United States,

> ***or by intending that others make, use, import into, offer for sale,
> or sell in the United States***, products and/or methods covered by one
> or more claims of the '520 Patent ['708 Patent], literally or by the
> doctrine of equivalents, including, but not limited to, Downing's
> Freedom Series technology.

Dkt. 1, ¶¶ 47 ('520 Patent), 55 ('708 Patent). IWS's bald, conclusory statement fails

to meet the most basic requirements for pleading contributory and induced

infringement.

IWS also alleges that Downing's infringement is willful. But IWS pleaded no

facts that Downing knew of the Asserted Patents before the service of the

Complaint. Accordingly, IWS's pre-suit willfulness claims should be dismissed.

### 1.    Contributory Infringement.

> "A party contributorily infringes a patent if: (1) it sells or offers to sell
> a material or apparatus for use in practicing a patented process;
> (2) that is material to practicing the invention; (3) which has no
> substantial non-infringing uses; (4) and is known by the party 'to be
> especially made or especially adapted for use in an infringement of
> such patent.'"

*Nobelbiz, Inc. v. Insidesales.com, Inc.*, No. 6:13-CV-360-MHS, 2014 WL 12378804, at

*4 (E.D. Tex. Oct. 14, 2014) (citing *In re Bill of Landing Transmission & Processing*

*Sys., Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012) (quoting 35 U.S.C.

§ 271(c))).

"To survive a motion to dismiss, a plaintiff must 'plead facts that allow an

inference that the components sold or offered for sale have no substantial non-

infringing uses.'" *Id.* "A substantial non-infringing use is one that is 'not unusual,

far-fetched, illusory, impractical, occasional, aberrant, or experimental.'" *Id.*

(quoting *Vita-Mix Corp. v. Basic Holdings, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir.

2009)). "The relevant inquiry is 'whether the accused products can be used for purposes other than infringement.'" *Id.* (quoting *Bill of Lading*, 681 F.3d at 1338). But it is not enough to allege that "if you use this device to perform the patented method, the device will infringe and has no noninfringing uses." *Id.* Plaintiff must also plead plausible facts that defendant "knew that the combination for which its components were especially made was both patented and infringing." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) (citation omitted). IWS pleaded no such allegations.

As noted above, IWS's allegations for contributory infringement of the Asserted Patents are limited to the following sentence: "***Downing has infringed, contributed to the infringement of, and/or induced infringement…by intending that others*** make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more claims of the [Asserted Patents]." Dkt. 1, ¶ 47 ('520 Patent), ¶ 55 ('708 Patent). IWS's allegations are even more bare than those this Court regularly rejects. For example, in *NobelBiz*, the complaint repeated the statutory "buzz words" of § 271(c) along with additional facts leading to a plausible claim of direct infringement. 2014 WL 12378804, at *3. Even so, the court found that the plaintiff failed to plead a claim for contributory infringement because it: (1) did not allege any facts as to the possible non-infringing use of the accused product beyond making the bare conclusion that it is not suitable for substantial noninfringing use; and (2) did not allege any facts that the defendant

actually knew of the asserted patents and knew that the accused product infringed those patents. *Id.*

IWS's Complaint alleges even less than in *NobelBiz*—IWS did not even repeat the statutory "buzz words" of § 271(c), let alone plead factual allegations supporting a plausible claim of contributory infringement. IWS's allegations cannot survive a motion to dismiss under Rule 12(b)(6).

### 2.    Induced Infringement.

"[A] complaint alleging induced infringement 'must contain facts plausibly showing' that defendant specifically intended another to infringe." *See Nobelbiz*, 2014 WL 12378804, at *4 (citing *In re Bill of Landing*, 681 F.3d at 1339). The requisite intent requires "evidence of active steps taken to encourage direct infringement." *BillJCo, LLC v. Cisco Sys., Inc.*, No. 2:21-CV-00181-JRG, 2021 WL 6618529 (E.D. Tex. Nov. 30, 2021) (quoting *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334 (Fed. Cir. 2019)). The "active steps" can include "advertising an infringing use," "instructing how to engage in an infringing use," and "assisting in performing an infringing use." *Motiva Patents LLC v. Sony Corp.*, 408 F. Supp. 3d 819, 828 (E.D. Tex. 2019). Further, while knowledge of the patent is required, it may be shown directly or through evidence of willful blindness. *Id.* (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765-66 (2011)). Thus, to survive a motion to dismiss, IWS's Complaint must set forth facts plausibly showing that Downing: (1) took active steps to induce another to directly infringe the Asserted Patents; and (2) had actual knowledge that the induced acts constituted infringement of the Asserted Patents. IWS failed to plead both.

*First*, the Court should dismiss IWS's induced infringement claims for the same reason as its contributory infringement claims—namely, that the Complaint contains no more than a threadbare recitation that Downing induces others to infringe. *See NobelBiz*, 2014 WL 12378804 at *4 (dismissing induced infringement claims under the same reasoning as contributory infringement claims). IWS pleaded no factual allegations in its Complaint that Downing had any knowledge of the Asserted Patents—let alone that Downing knowingly took actions intending another to infringe the Asserted Patents. *Second*, IWS pleaded no factual allegations in its Complaint that Downing took any steps—let alone active steps (e.g., marketing, advertising, assisting, etc.)—to induce another to directly infringe the Asserted Patents. Again, the only statement IWS makes in its Complaint is that "***Downing has infringed, contributed to the infringement of, and/or induced infringement…by intending that others*** make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by one or more claims of the [Asserted Patents]." Dkt. 1, ¶ 47 ('520 Patent), ¶ 55 ('708 Patent).

This Court routinely dismisses bare allegations like IWS's. *See e.g.*, *NobelBiz*, 2014 WL 12378804, at *4; *Klausner Techs., Inc. v. Applied Voice & Speech Techs., Inc.*, Case No. 6:12-CV-168, Dkt. 33 (Mar. 20, 2013); *IPVX Patent Holdings, Inc. v. Estech Sys., Inc.*, Case No. 6:12-CV-173, Dkt. 21 (Mar. 20, 2013). For example, in *Klausner*, the complaint alleged:

> Defendant is contributing to or inducing others, including its end users, distributors, and resellers, to make, use, sell, or offer to sell visual voicemail products that infringe the '576 Patent without a license or permission from Plaintiff.

33

No. 6:12-CV-168, Dkt. 33 at 1. The Court dismissed this claim for "fail[ing] to provide any factual support for these allegations." *Id.* at 4. And in *NorthStar Sys. LLC v. Volkswagen AG*, the Court found even more robust allegations (far more robust than IWS's allegations here) to be lacking. No. 2:22-CV-486-JRG, Dkt. 66 (Aug. 30, 2024). There, the Court found the induced infringement allegations insufficient because the complaint lacked allegations showing *"how* [defendant] induces a third party to perform any of the required steps of the method claims." *Id.* at 8. Here, IWS failed to plead both *how* Downing induces others to infringe and that Downing had pre-suit knowledge of the Asserted Patents.

IWS did not just fail to plead sufficient facts—it failed to plead any facts at all. IWS's allegations cannot survive a motion to dismiss under Rule 12(b)(6).

### 3. Pre-Suit Willfulness

The Complaint contains no allegations—factual or conclusory—that Downing had knowledge of the Asserted Patents before the filing of the Complaint. Failing to allege pre-suit knowledge of asserted patents warrants dismissal of pre-suit willful infringement claims. *Touchstream Techs., Inc. v. Altice USA, Inc.*, No. 2:23-CV-00059-JRG, 2024 WL 1117930, at *2-3 (E.D. Tex. Mar. 14, 2024). Accordingly, the Court should dismiss IWS's pre-suit willfulness claims.

## IV. CONCLUSION

IWS's bare-bones Complaint fails to plausibly plead a single cause of action and deprives Downing of the opportunity to adequately respond and defend itself against IWS's claims. IWS's trade secret misappropriation claims under the DTSA and TUTSA merely repeat the cause of action elements, but lack particularity as to

34

what IWS claims its trade secret(s) are or how Downing misappropriated them. IWS's patent infringement claims are premised on facially invalid claims directed to abstract ideas for engaging in a generic communication process. And IWS's indirect patent infringement (induced and contributory) and willful infringement claims comprise a single sentence that lacks even the bare recitation of the cause of action elements, let alone facts sufficient to state a plausible claim for relief. Accordingly, Downing respectfully requests that IWS's Complaint be dismissed in its entirety under Rule 12(b)(6).

Dated: October 15, 2024                    Respectfully submitted,

                                           By:    */s/ Tiffany M. Cooke*
                                                  John R. Emerson
                                                  Texas Bar No. 24002053
                                                  russ.emerson@haynesboone.com
                                                  Tiffany M. Cooke
                                                  Texas Bar No. 24087340
                                                  tiffany.cooke@haynesboone.com
                                                  Lee F. Johnston
                                                  Texas Bar No. 10839600
                                                  lee.johnston@haynesboone.com
                                                  Andrew Drott
                                                  Texas Bar No. 24126568
                                                  andrew.drott@haynesbroone.com
                                                  Dylan Freeman
                                                  Texas Bar No. 24131314
                                                  dylan.freeman@haynesboone.com
                                                  **HAYNES AND BOONE, LLP**
                                                  2801 N. Harwood Street, Suite 2300
                                                  Dallas, TX 75201
                                                  214-651-5000 (Telephone)
                                                  214-200-0615 (Facsimile)

                                                  **ATTORNEYS FOR DOWNING
                                                  WELLHEAD EQUIPMENT, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served on all counsel of record by electronic filing on this the 15th day of October, 2024.

/s/  *Tiffany M. Cooke*
Tiffany M. Cooke
