UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

No. 6:24-cv-00263

**Intelligent Wellhead Systems, Inc., et al.,**
*Plaintiffs,*

v.

**Downing Wellhead Equipment, LLC,**
*Defendant.*

# OPINION AND ORDER

Before the court is defendant's motion to dismiss for failure to state a claim. Doc. 32. Plaintiffs' amended complaint asserts claims for patent infringement and misappropriation of trade secrets. Doc. 27. Defendant argues that the infringement claims should be dismissed because the patents in suit—describing technology for regulating the position of a wellhead control mechanism—concern abstract ideas that are patent ineligible under 35 U.S.C. § 101. Defendant also asserts that the misappropriation claims should be dismissed because the amended complaint fails to identify a protectible trade secret or to establish misappropriation. The court held a hearing on this motion on July 11, 2025. For the reasons set forth below, defendant's motion is granted as to the patent claims and denied as to the misappropriation claims.

**I. Background**

Plaintiff Intelligent Wellhead Systems, Inc. (IWS) is the owner of two U.S. patents—Nos. 11,274,520 and 11,608,708—that concern wellhead control technology. Doc. 27 at 4–5. In drilling operations to retrieve petroleum hydrocarbon fluids, a single well pad may include many wellheads. Doc. 27-1 at 1:14–27 (the '520 patent); Doc. 27-3 at 1:14–27 (the '708 patent). Each wellhead may have "different operational requirements at a given time," which can cause busyness, miscommunication, and even accidents on the well pad. Doc. 27-1 at 1:14–27; Doc. 27-3 at 1:14–27. IWS's Digital Valve Control technology attempts to solve these

problems through its inVision System, which "integrates sensors, safety controls, actuators, control systems, and best practices." Doc. 27 at 5. Specifically, IWS's technology locks a wellhead control mechanism so that it cannot actuate until a user performs a handshake protocol with a controller circuit. *Id.* at 6–7.

All parties agree that independent claim 11 of the '520 patent is representative of that patent. Doc. 32 at 30; Doc. 33 at 30; *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) ("Courts may treat a claim as representative . . . if the parties agree to treat a claim as representative."). Claim 11 states:

> **Claim 11.** A system for controlling orientation of a valve, the system comprising:
> 
> a) a valve assembly that comprises:
>   i) a valve body for housing the valve that is configured to move between an open position, a closed position and therebe[t]ween for controlling a fluid flow therepast,
>   ii) an actuator that is positioned remotely from the valve body, wherein the actuator is configured to move between a first position, a second position and therebetween and wherein the actuator is operatively coupled to the valve by a conduit for controlling the position of the valve; and
>   iii) a controlled actuator that is configured to receive commands for moving the actuator,
> b) a controller that is configured to send commands to the controlled actuator.

Doc. 27-1 at 38:47–63.

Defendant also claims, and plaintiffs do not dispute, that independent claim 1 of the '708 patent is representative of that patent. Doc. 32 at 21; *see also Berkheimer*, 881 F.3d at 1365 ("Courts may treat a claim as representative . . . if the patentee does not present any meaningful argument for the distinctive significance

of any claim limitations not found in the representative claim . . . ."). Claim 1 states:

> **Claim 1.** A process for regulating a wellhead control mechanism, the process comprising:
>
> > locking out the wellhead control mechanism so that it cannot actuate; and
> >
> > performing a handshake protocol to determine if the locked out wellhead control mechanism can be released and then actuated, wherein the handshake protocol comprises an initiator signal communicated by a controller circuit to a first user and the first user sending a confirmatory signal to the controller circuit when the wellhead control mechanism can be unlocked safely.

Doc. 27-3 at 35:53–63.

Plaintiffs first accuse defendant of infringing these patents through its Freedom Series Valve, an automated "multi-chamber hydraulic valve" that "allow[s] for pressure to be automatically equalized between the surface and wellbore." Doc. 27 at 9. Plaintiffs also claim that defendant has misappropriated trade secrets, presenting the following chain of events as evidence.

In June 2020, while working together as vendors for a Pennsylvania wellsite, IWS and Downing were asked to integrate their respective systems. *Id.* at 11. Specifically, IWS's "dashboard and lockout mechanisms" were integrated with Downing's "system and application programming interface" so that the client could "remotely view information from Downing's valves using IWS's technology." *Id.* at 11–12. IWS claims that, as part of this process, it shared protectible trade secrets with Downing, including "source code, software architecture information, digital handshake information, and polling information." *Id.* at 12–13. According to IWS, these trade secrets were not readily available to the public and would require significant experience and resources to independently develop. *Id.*

In an April 2023 article released through the Society of Petroleum Engineering, Downing disclosed the use of a digital handshake "tied to each person authorized to use the system." *Id.* at 13. Downing also disclosed that its system dashboard provides "real-time status of all systems" and alerts for personnel. *Id.* Plaintiffs suggest IWS's trade secrets were used by Downing to improve its own systems and that a review of Downing's source code will confirm this theft.

## II. Analysis

Defendant initially filed a motion to dismiss the original complaint on October 15, 2024. Doc. 24. After plaintiffs filed an amended complaint, defendant filed a renewed motion to dismiss the amended complaint for failure to state a claim as to both the misappropriation and infringement counts. Doc. 32. As an initial matter, in light of the amended complaint and renewed motion to dismiss, the original motion (Doc. 24) is denied as moot. The court will consider the renewed motion (Doc. 32) as the operative filing in this matter.

To survive a motion to dismiss, a complaint must plead "only enough facts to state claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In ruling on a motion to dismiss, a court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Davis v. Tarrant Cnty.*, 565 F.3d 214, 217 (5th Cir. 2009) (quotation marks omitted).

### A. Subject-matter eligibility law

The court first analyzes defendant's argument that this case should be dismissed because the patents in suit concern abstract ideas that are patent-ineligible.

"Patent eligibility under 35 U.S.C. § 101 is ultimately an issue of law" and is thus generally amenable to resolution at the motion-to-dismiss stage. *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1289 (Fed. Cir. 2024). However, "[w]hile the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). In addition, patents are presumed valid and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a). Nevertheless, dismissal for invalidity at the Rule 12(b)(6) stage is appropriate "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software*, 882 F.3d at 1125.

Section 101 establishes four categories of patent-eligible subject matter—a process, machine, manufacture, or composition of matter. 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (cleaned up).

When analyzing patentability under § 101, a court should first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 77–78 (2012)). If that is indeed the case, the court should then consider whether the elements of each claim—"both individually and 'as an ordered combination'"—describe an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72–73).

As an initial matter, plaintiffs briefly argue that dismissal is inappropriate here because there is a "clear dispute" as to the

meaning of "handshake protocol." Doc. 33 at 20. However, the Federal Circuit has recently held that "[t]o defeat a motion to dismiss based on the purported need for claim construction, a patentee must propose a specific claim construction and explain why any dispute must be resolved before the scope of the claims can be understood for § 101 purposes." *Mobile Acuity*, 110 F.4th at 1293–94 (cleaned up). Here, plaintiffs do not propose any specific construction for the term "handshake protocol" and thus fail to establish that claim construction is necessary. *See* Doc. 33 at 19–21. At the hearing on the motion to dismiss, which was combined with a *Markman* hearing, the plaintiffs also failed to make such a showing. Based on the parties' briefing and arguments for the *Markman*, the court concludes that no outstanding claim-construction issues affect the dismissal analysis here.

## B. The '708 patent

### 1. *Alice* Step One: The claims are directed to an abstract idea

To determine whether claims are "directed to patent-ineligible subject matter," such as an abstract idea, the court should "look to the character of the claims as whole," including the patent's specification. *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1367 (Fed. Cir. 2024) (citing *Enfish v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)). Under *Alice* step one, the inquiry "often turns to the question of what the patent asserts as the claimed advance over the prior art." *Id.* In other words, "whether the claims 'focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke general processes and machinery.'" *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020). Additionally, "[t]he Supreme Court and [Federal Circuit] have repeatedly made clear that merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016).

Here, defendant argues that the claims of the '708 patent "are directed to the abstract idea of communicating generic signals." Doc. 32 at 21. According to defendant, the '708 patent describes nothing more than "locking out" a wellhead control mechanism and then performing a "handshake protocol" involving "initiator" and "confirmatory" signals. *Id.* Defendant points to the specification, which states that "miscommunication" due to "a complicated and busy well pad" is one of the main problems solved by this claimed invention. Doc. 27-3 at 1:25–27; *see also* Doc. 27 at 7 (amended complaint stating that "eliminat[ing] miscommunication" is an "advantageous result" of IWS's technology).

Plaintiffs respond that this characterization is at an impermissibly "high level of abstraction . . . untethered from the language of the claims." Doc. 33 at 23 (quoting *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361 (Fed. Cir. 2023)). According to plaintiffs, the amended complaint "clearly alleges" various "technological solutions" that improve wellsite safety and efficiency through "novel use of the claimed 'handshake protocol.'" *Id.* at 23–24. Plaintiffs urge that the invention here is not directed to an abstract concept because it "provide[s] an improved technological process of wellhead operation that increases safety by preventing well operators from unlocking a wellhead control mechanism . . . when it is unsafe to do so." *Id.* at 26.

Defendant first cites *In re Abel* for the proposition that "employing a generic computer to perform a communication practice is not a patent-eligible invention." Doc. 32 at 22 (citing *In re Abel*, 838 F. App'x 558, 561 (Fed. Cir. 2021) (unpublished)). In that case, the patent described a computer system for "allow[ing] . . . a user to send and receive physical letters and/or goods to another user without divulging personal information." *In re Abel*, 838 F. App'x at 559. The Federal Circuit determined that the patent was "directed to the abstract idea of generating a mailer defined by a set of rules for controlling the sender's access to the receiver's mailing address, which is a method of organizing human activity."

*Id.* at 560 (quotation marks omitted). Thus, "using a generic computer as a tool to perform a communication practice" is an abstract idea. *Id.* at 561.

The Federal Circuit has also "made clear that mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) (collecting cases). For example, in *Credit Acceptance Corp.*, the Federal Circuit concluded that using a computer to process loan applications constituted an abstract idea. *Id.* at 1054–55; *see also Phx. Licensing, LLC v. Consumer Cellular, Inc.*, No. 2:16-cv-00152, 2017 WL 1065938, at *22–23 (E.D. Tex. March 8, 2017) (holding that automating the "normally human-performed task . . . of tailoring marketing communications" is not patent-eligible). Courts have also held that claims involving a "handshake protocol" can be abstract. *See, e.g.*, *Cellspin Soft, Inc. v. Fitbit, Inc.*, 316 F. Supp. 3d 1138, 1154 (N.D. Cal. 2018) (holding that data transfer involving a handshake protocol was directed to an abstract idea under *Alice* step one), *vacated on other grounds*, 973 F.3d 1306 (Fed. Cir. 2019).

Defendant also points to the Federal Circuit's analysis in *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161 (Fed. Cir. 2019). That case featured a patent "directed to the abstract idea of crediting a merchant's account as early as possible while electronically processing a check." *Id.* at 1166. Importantly, the Federal Circuit rejected arguments that the "physicality of the paper checks being processed and transported" was sufficient to prevent the claims from being considered abstract. *Id.* at 1168. Defendant analogizes this reasoning to the patents at issue here, arguing that "[t]he step of 'locking' the well is insignificant pre-solution activity" that does not prevent a finding of abstractness. Doc. 32 at 25.

In response, plaintiffs cite three main cases. The first, *Diamond v. Diehr*, is a pre-*Alice* case where the Supreme Court held that a claimed process of "installing rubber in a press, closing the mold, constantly determining the temperature of the mold,

constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time" was patent-eligible. 450 U.S. 175, 187 (1981). The Supreme Court specifically noted that, even though the claims included use of a mathematical formula, "[i]ndustrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws." *Id.* at 184.

Next, plaintiffs point to *XY, LLC v. Trans Ova Genetics, LC*, 968 F.3d 1323, 1331 (Fed. Cir. 2020), which involved a method for classifying and sorting fluid particles using a flow cytometry apparatus. Doc. 25 at 33–34. Plaintiffs stress that, even though the patent included the use of "detectors" on the apparatus that sent and received signals, such communication did not render the claims abstract. *Id.* at 25–26. The Federal Circuit ultimately held that the claims at issue were not abstract because they articulated a new method for obtaining and manipulating data from particles to facilitate classification and sorting. *XY*, 968 F.3d at 1331–33.

Finally, plaintiffs cite *Thales Visionix, Inc. v. United States*, Doc. 26 at 33, where the Federal Circuit held as patent-eligible claims "directed to systems and methods that use inertial sensors in a non-conventional manner to reduce errors in measuring the relative position and orientation of a moving object on a moving reference frame." 850 F.3d 1343, 1348–49 (Fed. Cir. 2017).

The court concludes that, on balance, the claims at issue are directed to the abstract idea of communication through various signals sent between the wellhead control mechanism, a controller circuit, and a user. The asserted improvements to wellsite efficiency or safety come from using generic computer components to automate wellhead control mechanisms and thus limit human communicational errors during operation.

This is directly comparable to the methods for mitigating financial risk at issue in *Alice*. *See* 573 U.S. at 212–13. That case featured a method for "using a computer system as a third-party intermediary" to evaluate credit profiles, thereby "mitigating the

risk that only one party will perform the agreed-upon exchange." *Id.* at 213–14. The Supreme Court concluded that these claims were directed to the abstract idea of "intermediated settlement, . . . a fundamental economic practice long prevalent in our system of commerce." *Id.* at 219 (quotation marks omitted).

Here, the patent similarly describes the use of computer systems as a third-party intermediary to mitigate the risk of human error when operating a wellhead control mechanism. Thus, the '708 patent is directed an abstract idea. *See also PerformancePartners, LLC v. FlashParking, Inc.*, 697 F. Supp. 3d 678, 686–87 (W.D. Tex. 2023) (holding that a method for receiving identifying information from a car and then communicating whether the car should be allowed to exit was directed to an abstract idea). In short, preventing wellhead actuation until certain communication signals have occurred "is a quintessential abstract 'method of organizing human activity.'" *Id.* at 687 (quoting *Alice*, 573 U.S. at 219–20).

Plaintiffs' cited cases are also distinguishable. In *Diamond*, the Supreme Court specifically noted that the patent concerned the industrial process of curing rubber. 450 U.S. at 184. The Supreme Court emphasized that the claims at issue laid out a specific series of steps for this curing process, which transformed an article "to a different state or thing." *Id.* That is simply not the case here since wellhead control is not an industrial-treatment process. Simply put, doing some industrial operation (e.g., opening or closing a valve) after communication signals is not the same as a specific series of steps for curing rubber.

Similarly, the Federal Circuit in *XY* analogized to *Diamond*, reasoning that the asserted claims "describe[d] in detail a step-by-step method" for accomplishing a physical process—namely, separating particles. 968 F.3d at 1331. Plaintiffs argue that, since the patent-eligible invention in *XY* involved signals from detectors, the presence of communication signals here does not establish abstractness. Doc. 33 at 25–26. But the focus in *XY* was not on communication with sensors, but on separating particles through a

particular use of a flow cytometry apparatus. Here, the focus of the asserted claims is communicating to a user whether it is safe to actuate a wellhead-control mechanism and then sending a "confirmatory signal" from the user to a control circuit. Put differently, the technology automates actions that could be performed by two workers on walkie-talkies, where one worker keeps a well control mechanism locked until receiving a "confirmatory" all-clear signal from the other worker.

Finally, the inertial sensors in *Thales Visionix* were patent-eligible because of their unique configuration, which enabled the calculation of inertial data for an object on a moving platform. 850 F.3d at 1348–49. The patent here does not specify a unique placement or orientation of sensors, or an inventive manner of measuring fluid pressure. It only states that sensors can be used to communicate through a control circuit whether actuation of a wellhead control mechanism is safe. *See* Doc. 27-1 at 38:64–39:7; Doc. 27-3 at 37:1–17.

In sum, the '708 patent is directed to the abstract idea of communication between a wellhead control mechanism and a user, including safety data and signals concerning actuation.

### 2. *Alice* Step Two: The claims are non-inventive

In *Alice* step two, the court considers whether the claim contains an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18 (alteration in original). "A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 221 (cleaned up). For example, in *Alice*, "the claims at issue amount[ed] to nothing significantly more than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer." *Id.* at 225–26 (quotation marks omitted).

Plaintiffs point out that "an inventive concept can be found in . . . the non-conventional and non-generic arrangement of

known, conventional pieces." Doc. 33 at 28 (quoting *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)). Plaintiffs—in a very brief response on inventiveness—appear to suggest that "the claimed handshake protocol itself . . . [is] inventive" in the context of wellhead control. *Id.* at 28–29. However, a handshake protocol is a "generic feature[]" of computer operations. *Affinity*, 838 F.3d at 1262–63 (noting that "generic computer implementation is insufficient to transform a patent-ineligible abstract idea into a patent-eligible invention" (quotation marks omitted)).

Here particularly, the handshake protocol merely computerizes the abstract idea of communicating between a user and the wellhead control mechanism. "[A] claim is not rendered patent eligible by stating an abstract idea and instructing 'apply it on a computer . . . .'" *Trinity*, 72 F.4th at 1367. As defendant points out, "a claim directed to a newly discovered . . . abstract idea cannot rely on the novelty of that discovery for the inventive concept necessary for patent eligibility." Doc. 32 at 27 (cleaned up) (quoting *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1376 (Fed. Cir. 2016)).

The court also agrees with defendant that "locking" the wellhead control mechanism is a "purely conventional or obvious pre-solution activity" that fails to establish an inventive concept. Doc. 32 at 28–29 (quoting *Mayo*, 566 U.S. at 79). Furthermore, the particular ordered combination of claim steps here—locking a wellhead control mechanism and then performing a handshake protocol—is not inventive and thus cannot save the patent. The court thus grants dismissal as to infringement of the '708 patent because it does not claim patent-eligible subject matter.

C. The '520 patent

For much of the same reasons as the '708 patent, the court concludes that the '520 patent merely automates a physical process and is thus directed to an abstract idea. In short, claim 11 of the '520 patent merely provides instructions to automate the opening and shutting of a well control mechanism through a

controller that communicates with a controlled actuator. In other words, this is the actuator companion of the '708 patent, describing the other side of the handshake protocol. The court agrees with defendant that such automation of a manual process is non-patentable. *See Credit Acceptance Corp.*, 859 F.3d at 1055.

Plaintiffs respond that this patent is directed to the "hardware valve assembly whose elements it recites." Doc. 33 at 31. However, "not every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry." *In re TLI Commc'ns Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016); *see also Guvera IP Pty Ltd. v. Spotify, Inc.*, No. 1:21-cv-04544, 2022 WL 4537999, at *3 (S.D.N.Y. Sept. 28, 2022) ("If the patent claims an abstract 'result or effect' while invoking 'generic processes and machinery,' then the claims are directed to an abstract idea." (quoting *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1363 (Fed. Cir. 2021))). Ultimately, defendant is correct that, just like the '708 patent, the '520 patent is directed to the "abstract idea of using a generic computer to send and receive signals to control the position of a valve." Doc. 32 at 31.

The court also does not discern an inventive concept here. The valve assembly is described in the most generic terms. At base, this claim could simply be read as: "connect a conventional valve assembly to a generic computer." Plaintiffs barely respond on this point, merely pointing back to the amended complaint. *See* Doc. 33 at 32. Thus, the court cannot conclude that the claims here "amount[] to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18 (second alteration in original). The court grants dismissal as to infringement of the '520 patent because it does not claim patent-eligible subject matter.

### D. The trade secret claims survive Rule 12(b)(6)

Plaintiffs bring claims for trade secret misappropriation under both the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1836 *et seq.*, and the Texas Uniform Trade Secrets Act (TUTSA), Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001 to

134A.008.[1] Doc. 27 at 20–24. To succeed on these claims, plaintiffs must show: (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) defendant used the trade secret without authorization. *See* 18 U.S.C. §§ 1832, 1839; Tex. Civ. Prac. & Rem. Code Ann. § 134A; *see also Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 874 (5th Cir. 2013) (listing the necessary elements of a trade secret misappropriation claim).

### 1. Plaintiffs identify a protectible trade secret

For purposes of both the DTSA and TUTSA, a "trade secret" is defined as follows:

> the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . .

---

[1] "The DTSA and TUTSA provide nearly identical causes of action for trade secret misappropriation." *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 559 (N.D. Tex. 2024) (first citing 18 U.S.C. §§ 1836(b)(1), 1839(3), (5), (6); and then citing Tex Civ. Prac. & Rem. Code § 134A.002(2), (3), (6)). Both statutes include nearly identical definitions of "misappropriation" and "trade secret," and although DTSA includes an additional interstate component, both statutes require the plaintiff to allege the existence of a trade secret and misappropriation by the defendant. *Id.* at 559–60. The court analyzes these claims together.

18 U.S.C. § 1839(3); Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).

Defendant first argues that plaintiffs have failed to identify a protectible trade secret because the amended complaint does not sufficiently distinguish the alleged trade secrets from information in the public domain. Doc. 32 at 10–13. Defendant points to *Topstone Communications, Inc. v. Xu*, where the court dismissed a claim alleging misappropriation of a customer list because the pleadings "[did] not separate [the] information from matters of general knowledge." 729 F. Supp. 3d 701, 706–07 (S.D. Tex. 2024) (reasoning that "[w]hile plaintiffs need not identify specific trade secrets in their pleadings, they do need to describe the trade secrets with enough clarity for defendants to understand how each claimed trade secret differs from information in the public domain" (cleaned up)).

According to defendant, plaintiffs simply "parrot" the language of DTSA and TUTSA, with only vague and generic references to alleged confidential information such as "source code, software architecture information, digital handshake information, and polling information." Doc. 32 at 11–12. Defendant maintains that "generally listing software, data processing algorithms, and processes that a plaintiff developed, owned, or licensed" is insufficient. Doc. 32 at 12 (emphases omitted) (quoting *StoneEagle Servs., Inc. v. Valentine*, No. 3:12-cv-01687, 2013 WL 9554563, at *4 (N.D. Tex. June 5, 2013)). Defendant also highlights a "growing consensus among district courts in this circuit that plaintiffs bringing claims of trade secret misappropriation must identify, with reasonable particularity, the alleged trade secrets at issue." *Id.* at 10 (cleaned up) (quoting *Topstone*, 729 F. Supp. 3d at 706).

Plaintiffs respond, and this court agrees, that "dismissal is reserved for cases where a trade secret claim is so vague that it fails to provide fair notice to the defendant." Doc. 33 at 10 (citing *Scott Env't Servs., Inc. v. Newfield Expl. Co.*, No. 2:19-cv-00026, 2019 WL 6220968, at *2 (E.D. Tex. Oct. 23, 2019), *report and recommendation adopted*, 2019 WL 6208544 (E.D. Tex. Nov. 20, 2019)).

Plaintiffs submit that the amended complaint describes with particularity the following "specific elements" of the trade secrets:

- The "background software architecture of IWS's system," which involves proprietary coding and integration with third-party sensors. Doc. 27 at 12.
- The "polling structure in IWS's system," which enhances data latency and is uniquely designed for IWS's technology. *Id.*
- "Digital handshake [information] . . . tied to each person authorized to use the system." *Id.* at 13.
- The "system dashboard," which provides real-time alerts and status updates critical to operational safety. *Id.* at 13–14.

Doc. 33 at 10 (alteration in original).

Here, the court agrees that plaintiffs' amended complaint is sufficiently pleaded to survive a motion to dismiss. The Fifth Circuit has noted that motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). Furthermore, "the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side." *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011) (quotation marks omitted).

The cases cited by defendant are distinguishable. Even in *Topstone*—the case where the complaint generically referenced a customer list—the court recognized that it was a "close case." 729 F. Supp. 3d at 706. The citation from *StoneEagle*, stating that generally listing software is insufficient, originates from a case out of the Northern District of Georgia, where a discovery disclosure only revealed "the end results of, or the functions performed by, the claimed trade secrets." *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 679 (N.D. Ga. 2007). The "growing consensus" toward greater particularity also largely rests on motions for

protective orders or motions to compel, not dismissals. *See StoneEagle*, 2013 WL 9554563, at *2 (collecting cases).

The amended complaint provides sufficient information to give defendant notice of the trade secrets at issue. Plaintiffs have identified that these secrets were shared with defendant during their work together on a specific Pennsylvania wellsite. Doc. 27 at 11–12. Consequently, the references to "system dashboard," "polling structure," and "background software architecture" should give defendant notice of the trade secrets that will be the subject of this litigation. Thus, the amended complaint sufficiently distinguishes the alleged trade secrets from information in the public domain.

Next, defendant argues that, because the patents at issue here reference a "handshake protocol" and "user interface," the alleged trade secrets are not actually secret at all. Doc. 32 at 13–14 (citing *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) ("That which is disclosed in a patent cannot be a trade secret.")). However, the court agrees with plaintiffs that "[t]hese [alleged] trade secrets pertain to the granular implementations of IWS's proprietary technology—details such as source code and specific software protocols—that are not described in the patents." Doc. 33 at 11; *see also Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 563 (S.D. Tex. 2011) ("Texas law also recognizes that trade secret status may be maintained along with patent protection in situations where the patent does not disclose the exact information or details that a plaintiff contends are trade secrets."), *aff'd*, 716 F.3d 867 (5th Cir. 2013). Again, this is adequately pleaded, although factual development may occur.

Finally, defendant asserts that there is no protectible trade secret here because the amended complaint allegedly fails to establish that the trade secrets derive "independent economic value" from their secrecy. Doc. 32 at 15. However, the complaint alleges that the "confidential information derived considerable value from not being publicly known outside of IWS" and conferred a "competitive advantage" upon IWS. Doc. 27 at 12–13. The

complaint also alleges that the confidential information would take significant time and resources to independently develop. *Id*. Additionally, the trade secrets are alleged to provide value because they "improve data latency." *Id*. at 13. Defendant complains that these are generic and conclusory statements. However, those statements offer enough specificity about the alleged economic value to provide the notice required by Rule 12(b)(6). *See Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 562–63 (N.D. Tex. 2024) (holding that similar claims of economic value were adequate).

Plaintiffs have sufficiently alleged a protectible trade secret.

### 2. **Plaintiffs plausibly allege misappropriation of a trade secret**

In support of its motion to dismiss, defendant next argues that the amended complaint does not plausibly allege misappropriation. Defendant insists that the amended complaint does not connect the use of a "digital handshake" and "system dashboard" in its Freedom Series with the technology that plaintiff IWS shared with defendant. Doc. 32 at 15–16. According to defendant, alleging mere access is not enough—actual use is required to establish misappropriation. *Id*. Defendant also casts doubt on whether it plausibly used the trade secrets in its Freedom Series, when that technology potentially predates any access to IWS's systems. *Id*. at 16–17.

Defendant is correct that some form of use is required to establish misappropriation. *See GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325–26 (5th Cir. 2018). However, as plaintiffs note, "proof of trade secret misappropriation often depends upon circumstantial evidence." *Id*. at 326 (cleaned up); *see also Spear Mktg., Inc. v. BancorpSouth Bank*, No. 3:12-cv-03583, 2014 WL 2608485, at *11 (N.D. Tex. June 11, 2014) (noting that "at least nine federal circuit courts have concluded that trade secret misappropriation may be demonstrated by circumstantial evidence, such as access to the trade secret by the misappropriating party and similarity between the secret and the defendant's design" (quotation marks omitted)).

- 18 -

Here, plaintiffs plead sufficient facts to plausibly suggest misappropriation. Taking the allegations in the complaint as true, IWS shared its trade secrets with Downing during their collaboration in June 2020. Doc. 27 at 11–12. In the April 2023 article, Downing disclosed the use of a digital handshake and system dashboard. *Id.* at 13. Further, before June 2020, Downing had not referenced either feature. *Id.* at 14. That is sufficient circumstantial evidence of misappropriation. It is also reasonable that, without additional discovery, plaintiffs will not be able to precisely determine what specific parts of their source code have been misappropriated. The pleadings suffice to survive a motion to dismiss. Defendant's motion to dismiss the trade secret claims is denied.

### III. Conclusion

Both the '520 and '708 patents are directed to patent-ineligible subject matter, so the court grants the motion to dismiss (Doc. 32) as to the infringement claims. But the court denies the motion to dismiss the trade-secret claims. The prior motion to dismiss (Doc. 24) is denied as moot. Because the infringement claims are dismissed in this order, the court declines to issue final claim-construction rulings on the terms discussed at the *Markman* hearing.

Although the trade-secret claims survive dismissal on the pleadings, the court reiterates that plaintiffs must identify the alleged trade secrets with "reasonable particularity"—beyond what is required under mere notice-pleading standards—now that discovery is ongoing (and has been ongoing for some time). *StoneEagle*, 2013 WL 9554563, at *2. At the recent hearing on the motion, plaintiffs suggested that they had provided, or would shortly be providing, defendant with additional details as to the trade-secret allegations. Within two weeks of the date of this order, the parties shall update the court as to whether any further action on this issue is required. If necessary, defendant may also file a motion to compel discovery or a motion for a more definite statement under Federal Rule of Procedure 12(e).

*So ordered by the court on August 5, 2025.*

                    J. CAMPBELL BARKER
                   United States District Judge